Citation Nr: 1331548 
Decision Date: 09/30/13 Archive Date: 10/02/13

DOCKET NO. 06-28 907 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Des Moines, Iowa


THE ISSUES

1. Entitlement to a disability rating in excess of 10 percent for posttraumatic stress disorder (PTSD), for purposes of accrued benefits. 

2. Entitlement to a total disability rating based on individual unemployability (TDIU), for purposes of accrued benefits. 


REPRESENTATION

Appellant represented by: The American Legion


WITNESS AT HEARING ON APPEAL

Appellant


ATTORNEY FOR THE BOARD

Timothy D. Rudy, Counsel


INTRODUCTION

The Veteran served on active duty from June 1975 to October 1977. He died in January 2004. The appellant is his surviving spouse. 

This matter comes before the Board of Veterans' Appeals ("Board") on appeal from a December 2004 rating decision issued by the Department of Veterans Affairs (VA) Regional Office (RO) in St. Louis, Missouri, which denied the appellant's claim of entitlement to accrued benefits. Jurisdiction of the appellant's case was subsequently transferred to the RO in Des Moines, Iowa. 

In October 2007, the appellant testified at a video conference Board hearing before the undersigned Veterans Law Judge. A transcript of the hearing has been associated with the Veteran's claims folder. 

This matter was remanded for additional development in Board decisions dated in February 2008, August 2011, and April 2013. 


FINDINGS OF FACT

1. The Veteran died in January 2004; at the time of his death he had claims pending for an increased rating for PTSD and entitlement to a TDIU. 

2. At the time of his death, the Veteran was in receipt of a 10 percent disability rating for his service-connected PTSD; resolving all doubt in the Veteran's favor, for the period from June 24, 1999, when the Veteran filed his claim for service connection, his PTSD was manifested by occupational and social impairment with deficiencies in most areas. 

3. At the time of his death, the Veteran's only service-connected disability was PTSD. 

4. At the time of his death, the evidence of record shows that the Veteran met the minimum criteria for schedular TDIU; the evidence is at least in equipoise regarding whether his service-connected disability rendered him unable to secure or follow a substantially gainful occupation. 


CONCLUSIONS OF LAW

1. The criteria for an initial disability rating of 70 percent, but no higher, for PTSD, for accrued benefits purposes, for the period from June 24, 1999, have been met. 38 U.S.C.A. §§ 1155, 5121 (West 2002 & Supp. 2012); 38 C.F.R. §§ 3.1000, 4.1-4.14, 4.125-4.130, Diagnostic Code 9411 (2012). 

2. Resolving all reasonable doubt in the Veteran's favor, the criteria for entitlement to a TDIU for accrued benefits purposes, have been met during the entire appeal period at issue. 38 U.S.C.A. §§ 1155, 5107, 5121 (West 2002 & Supp. 2012); 38 C.F.R. §§ 3.340, 3.341, 3.1000, 4.16 (2012). 



REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Veterans Claims Assistance Act of 2000 (VCAA)

The provisions of the VCAA, codified at 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a) and as interpreted by the United States Court of Appeals for Veterans Claims (the Court), have been fulfilled by information provided to the appellant in letters from the RO dated in September 2006, March 2008, August 2009, October 2011, and April 2013. These letters notified the appellant of VA's responsibilities in obtaining information to assist the appellant in completing her claims, and identified her duties in obtaining information and evidence to substantiate her claims. Subsequently, the accrued benefits claims on appeal were adjudicated in a supplemental statement of the case issued in May 2013. (See 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a); Quartuccio v. Principi, 16 Vet. App. 183 (2002); Pelegrini v. Principi, 18 Vet. App. 112 (2004). See also Mayfield v. Nicholson, 19 Vet. App. 103, 110 (2005), reversed on other grounds, 444 F.3d 1328 (Fed. Cir. 2006); Dingess/Hartman v. Nicholson, 20 Vet. App. 473 (2006); Mayfield v. Nicholson (Mayfield II), 20 Vet. App. 537 (2006)). 

During the pendency of this appeal, the Court in Dingess/Hartman held that the VCAA notice requirements of 38 U.S.C. § 5103(a) and 38 C.F.R. § 3.159(b) apply to all elements of a claim. This includes, where applicable, notice that a disability rating and an effective date for the award of benefits will be assigned if service connection is awarded. The appellant was given this notice in the September 2006 and March 2008 correspondence. 

Considering the determination reached in this decision the Board is satisfied that adequate notice and development have taken place and that there is a sound evidentiary basis for resolution of the TDIU claim without detriment to the due process rights of the appellant. 

As to the higher rating claim, the appellant has neither alleged nor demonstrated any prejudice with regard to the content or timing of the notices. See Shinseki v. Sanders, 129 S. Ct. 1696 (2009) (reversing prior case law imposing a presumption of prejudice on any notice deficiency, and clarifying that the burden of showing that an error is harmful, or prejudicial, normally falls upon the party attacking the agency's determination). In view of the above, the Board finds that the notice requirements pertinent to the issue of a higher initial rating for PTSD have been met. 

The Board observes that VA also has satisfied its duty to assist the appellant. The appellant has been provided with every opportunity to submit evidence and argument in support of her claim, and to respond to VA notices. Specifically, VA has associated with the claims folder the Veteran's service treatment records, VA and private treatment records, medical records from the Social Security Administration (SSA), as well as reports of VA examinations. The appellant also testified during a Board hearing before the undersigned. 

The Board finds that any deficiency in compliance with the VCAA has not prejudiced the appellant and is, thus, harmless error. See ATD Corp. v. Lydall, Inc., 159 F.3d 534, 549 (Fed. Cir. 1998); Bernard v. Brown, 4 Vet. App. 384 (1993). 

Accrued Benefits Claims

VA law provides that where death occurred on or after December 1, 1962, periodic monetary benefits (other than insurance and service members' indemnity) authorized under laws administered by VA, to which a payee was entitled at his or her death under existing ratings or decisions or those based on evidence in the file at date of death, and due and unpaid will, upon the death of such person, be paid as defined by regulation. See 38 U.S.C.A. § 5121 (West 2002 & Supp. 2012); 38 C.F.R. § 3.1000(a) (2012). 

Evidence in the file at date of death means evidence in VA's possession on or before the date of the beneficiary's death, even if such evidence was not physically located in the VA claims folder on or before the date of death, in support of a claim for VA benefits pending on the date of death. 38 C.F.R. § 3.1000(d)(4). A claim for VA benefits pending on the date of death means a claim filed with VA that had not been finally adjudicated by VA on or before the date of death. 

The United States Court of Appeals for the Federal Circuit (Federal Circuit) has held that an accrued benefits claim is derivative of the veteran's claim and that an accrued benefits claimant cannot be entitled to a greater benefit than the veteran would have received had he lived. See Zevalkink v. Brown, 6 Vet. App. 483, 489-90 (1994), aff'd, 102 F.3d 1236 (Fed. Cir. 1996), cert. denied, 117 S. Ct. 2478 (1997) (holding that "the substance of the survivor's claim is purely derivative from any benefit to which the veteran might have been 'entitled' at his death [and gives the survivor] the right to stand in the shoes of the veteran and pursue his claim after his death."). 

Service connection for PTSD was granted in a September 2002 Board decision due to physical and sexual abuse during service. A March 2003 rating decision then implemented that decision and awarded a zero percent disability rating, effective June 24, 1999. In April 2003, the Veteran filed a claim for a TDIU. In a May 2003 rating decision the PTSD disability rating was increased from noncompensable to 10 percent, effective June 24, 1999, and his claim for a TDIU was denied. In June 2003, the Veteran filed a Notice of Disagreement beginning an appeal for a rating in excess of 10 percent disabling for his PTSD and for entitlement to a TDIU. VA mental examinations were performed in December 2000, December 2002, and April 2003. 

Records show that subsequently, in January 2004, the Veteran died as a result of a myocardial infarction and coronary artery disease. The appellant's application for VA benefits was received in March 2004. The Board finds that a claim for accrued benefits was timely filed and that the issues developed for appellate review must be decided based upon the evidence in VA's possession on or before the date of the Veteran's death. 

Increased Rating - Laws and Regulations 

Disability ratings are determined by the application of VA's Schedule for Rating Disabilities (Rating Schedule), 38 C.F.R. Part 4. The percentage ratings in the Rating Schedule represent, as far as can be practicably determined, the average impairment in earning capacity resulting from diseases and injuries incurred or aggravated during military service and their residual conditions in civil occupations. 38 U.S.C.A. § 1155 (West 2002); 38 C.F.R. § 4.1 (2012). 

In order to evaluate the level of disability and any changes in condition, it is necessary to consider the complete medical history of the veteran's condition. Schafrath v. Derwinski, 1 Vet. App. 589, 594 (1991). The Court has held that a claim for a higher rating when placed in appellate status by disagreement with the original or initial rating award (service connection having been allowed, but not yet ultimately resolved), remains an "original claim" and is not a new claim for an increased rating. See Fenderson v. West, 12 Vet. App. 119 (1999). In such cases, separate compensable evaluations may be assigned for separate periods of time if such distinct periods are shown by the competent evidence of record during the pendency of the appeal, a practice known as "staged" ratings. Id. at 126. 

It is the responsibility of the rating specialist to interpret reports of examination in light of the whole recorded history, reconciling the various reports into a consistent picture so that the current rating may accurately reflect the elements of disability present. 38 C.F.R. § 4.2. Consideration of factors wholly outside the rating criteria constitutes error as a matter of law. Massey v. Brown, 7 Vet. App. 204, 207-08 (1994). Evaluation of disabilities based upon manifestations not resulting from service-connected disease or injury and the pyramiding of ratings for the same disability under various diagnoses are prohibited. 38 C.F.R. § 4.14. 

As a general matter, lay statements are considered to be competent evidence when describing the features or symptoms of an injury or illness. See Falzone v. Brown, 8 Vet. App. 398, 405 (1995). As a layperson the Veteran is only competent to report observable symptoms, but not the clinical findings which are applied to VA's Rating Schedule. See Barr v. Nicholson, 21 Vet. App. 303 (2007); Bruce v. West, 11 Vet. App. 405, 410-11 (1998). 

When there is a question as to which of two evaluations to apply, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that rating, otherwise the lower rating shall be assigned. 38 C.F.R. § 4.7. 

It is the policy of VA to administer the law under a broad interpretation, consistent with the facts in each case with all reasonable doubt to be resolved in favor of the claimant; however, the reasonable doubt rule is not a means for reconciling actual conflict or a contradiction in the evidence. 38 C.F.R. § 4.3. 

The Veteran's PTSD rating has been adjudicated pursuant to the rating criteria found in 38 C.F.R. § 4.130, Diagnostic Code 9411. 

Under that code and the General Rating Formula for Mental Disorders, ratings may be assigned ranging between 0 and 100 percent. A 10 percent disability rating is appropriate when there is occupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress, or; symptoms controlled by continuous medication. 

A 30 percent disability rating is appropriate when there is occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, mild memory loss (such as forgetting names, directions, recent events). 

A 50 percent disability rating requires occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships. 

A 70 percent rating requires occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a worklike setting); inability to establish and maintain effective relationships. 

A 100 percent rating requires total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation, or own name. 

The symptoms recited in the criteria in the rating schedule for evaluating mental disorders are "not intended to constitute an exhaustive list, but rather are to serve as examples of the type and degree of the symptoms, or their effects, that would justify a particular rating." Mauerhan v. Principi, 16 Vet. App. 436, 442 (2002). In adjudicating a claim for an increased rating, the adjudicator must consider all symptoms of a claimant's service-connected mental condition that affect the level of occupational or social impairment. Id. at 443. 

When evaluating a mental disorder, the evaluation must be based on all the evidence of record that bears on occupational and social impairment rather than solely on the examiner's assessment of the level of disability at the moment of the examination. 38 C.F.R. § 4.126(a). Further, when evaluating the level of disability from a mental disorder, the extent of social impairment is considered, but the rating cannot be assigned solely on the basis of social impairment. 38 C.F.R. § 4.126(b). 

Reports of psychiatric examination and treatment frequently include a Global Assessment of Functioning (GAF) score. According to the Fourth Edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), a GAF scale includes scores ranging between zero and 100 which represent the psychological, social, and occupational functioning of an individual on a hypothetical continuum of mental health-illness. The GAF score and the interpretations of the score are important considerations in rating a psychiatric disability. See, e.g., Richard v. Brown, 9 Vet. App. 266, 267 (1996); Carpenter v. Brown, 8 Vet. App. 240 (1995). However, an assigned GAF score, like an examiner's assessment of the severity of a condition, is not dispositive of the percentage rating issue; rather, it must be considered in light of the actual symptoms of a psychiatric disorder (which provide the primary basis for the rating assigned). See 38 C.F.R. § 4.126(a). 

A GAF score of 21 to 30 indicates behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends). 

A GAF score of 31 to 40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). 

A GAF score of 41 to 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job). 

A GAF score of 51 to 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). 

A GAF score of 61 to 70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well with some meaningful interpersonal relationships. 


PTSD

Historically, service connection for PTSD was granted in a September 2002 Board decision due to physical and sexual abuse during service. A March 2003 rating decision awarded a zero percent disability rating, effective June 24, 1999, the date of the Veteran's initial claim. In a May 2003 rating decision the disability rating was increased from noncompensable to 10 percent, effective June 24, 1999. In his June 2003 Notice of Disagreement the Veteran claimed that his PTSD was more severe than 10 percent as he said that he was unable to work due to having nightmares, flashbacks, depression, anger, and daily anxiety attacks with some lasting for a couple of days. He said he had problems with relationships and had no one he could trust. 

Private medical records in July 1999 from the Gannon Center show that the Veteran had been referred from a private hospital where he went with a complaint that he was fearful he was going to hurt someone after a confrontation with a fellow employee at work. The intake interview report noted a long-standing history of difficulties with anger control. Mental status examination noted some homicidal thoughts, but no suicidal ideation. He was moderately groomed with an angry mood. There was no evidence of hallucinations or delusions. Diagnoses included a moderate major depressive disorder and provisional PTSD. A GAF score of 50 was assigned. Eleven days later, a counseling session record noted that the Veteran's insight was fairly poor, he had below average knowledge, and his mood was somewhat depressed. Affect was fairly flat. It was noted that the Veteran and his wife had been basically homeless for the past few months. A GAF score of 48 was given. 

A July 23, 1999 private medical record noted that the Veteran saw a private physician that day because he felt that he had had a seizure that morning. He told the doctor that he was at work in his cab when he noticed his arms and legs shaking for about 10 to 15 seconds. He never lost consciousness and continued driving. He later had a headache. Examination was within normal limits. The physician noted that he was not sure that the Veteran had had any seizure-like activity. 

An August 1999 private hospital record noted a three-day hospitalization the Veteran sought out of concern he could not control himself. He told providers that he was afraid that he was going to blow up because of recent stressors. Prior to discharge he felt in much better control, but was still concerned about his financial status. He agreed to outpatient care and medication. It was noted that the Veteran denied suicidal and homicidal ideation and showed no evidence of psychosis. Affect was blunted. Diagnosis was recurrent major depression with a GAF score of 50 assigned. 

August 1999 private medical records from the Gannon Center noted that the Veteran was off work for six months because a physician felt the Veteran should be due to his seizures. It was also noted that he had PTSD-type flashbacks of sexual abuse both at age 13 and while in service. The private mental health counselor noted that the Veteran also had PTSD from the death of his brother nine years ago. These records noted that he was not suicidal or homicidal. GAF scores of 45 and 46 were assigned. 

An August 1999 VA medical record noted a possible PTSD diagnosis with PTSD symptoms including isolation, anxiety, and nightmares. 

In conjunction with his request for disability benefits from the Social Security Administration (SSA) a private psychologist in September 1999 diagnosed the Veteran with recurrent major depressive disorder and a mixed personality disorder with dependent and schizoid personality traits predominant. His report noted that a provisional diagnosis of PTSD would need more development before it was officially ruled in as a diagnosis. In October 1999, the Veteran was examined for SSA and diagnosed with depression, a seizure disorder by history, and PTSD by history. 

VA medical records dated in October 1999 and November 1999 noted that the Veteran reported a worsening of depressive symptoms; episodes of recurrent memories of abuse; and occasional nightmares. He denied hallucinations, except for hearing music. 

A January 2000 VA mental status examination noted an Axis I diagnosis of dysthymia with a GAF score of 60 assigned. There were no delusions or hallucinations noted and no suicidal or homicidal ideations. 

In February 2000, the Veteran underwent psychological testing for his SSA disability claim. On mental status examination, affect was somewhat blunted but he consistently conveyed depression and sadness. He denied ever experiencing auditory or visual hallucinations and did not report suicidal or homicidal ideation. He was noted slow in thought and speech. He was diagnosed with PTSD as well as recurrent, severe major depression without psychotic features. A GAF score of 50 was assigned. 

According to a March 2000 VA psychiatric record the Veteran was anxious and depressed, but his mood had improved somewhat. He was sleeping well, had a good appetite, and denied anhedonia. It was noted that the Veteran was irritable and lost his temper on occasion. Diagnosis was dysthymia (improved) with a GAF score of 70 assigned. 

In March 2000, in conjunction with the Veteran's SSA claim, a state psychologist diagnosed the Veteran with PTSD as well as severe, recurrent major depression without psychotic features. In March 2000, the Veteran was awarded SSA disability for major depression and an orthopedic complaint. 

During his RO hearing in April 2000, the Veteran testified that his drill sergeant had kicked him in the side of the head on at least five occasions. See hearing transcript at pp. 3-4. He also testified that he had seizures on average about twice a month. Id. at p. 14. 

An April 2000 VA psychiatric record noted increasing depressive symptoms over the past week with a low mood, decreased concentration, insomnia, and intermittent suicidal ideation. 

An April 2000 discharge summary from the VA hospital noted an Axis I history of PTSD and an adjustment disorder. A GAF score of 25 on admission and 50 at discharge was noted. At this time the Veteran had been hospitalized for suicidal ideation. His mental status examination on admission noted auditory hallucinations. 

A June 2000 VA medical record noted a diagnosis of depression and anxiety, but not PTSD. A GAF score of 65 was assigned. 

An August 2000 VA medical record noted that the Veteran was confused about his sexual orientation and went into rages when sexual traumas were triggered. The VA staff psychologist reported that the Veteran endorsed significant symptoms of a dissociative disorder. It was also noted that at times the Veteran wanted to hurt himself, but feared this. 

A later August 2000 VA psychiatric record noted that the Veteran's wife, family and finances were significant stressors. While he had depressive symptoms, he had good concentration, good sex drive, good appetite, and good sleep. He denied thoughts of harming himself or others. On mental status examination, an euthymic mood was noted and affect was restricted. There was no suicidal or homicidal ideation and no delusions or hallucinations. Diagnosis was dysthymia with a GAF score of 68 assigned. 

An October 2000 VA psychiatric record noted that the Veteran appeared to have a frontal lobe syndrome, which left the impression he was very dull. Short term memory was weak. A VA neuropsychologist recorded an impression that multiple head injuries resulted in the Veteran being very poor at insight and was a poor listener. 

According to a November 2000 VA medical record, the Veteran had intermittent depression, but denied sleep disturbance, loss of appetite, hopelessness, or anhedonia. Psychotherapy appointments were discontinued as neuropsychiatric testing showed a frontal lobe syndrome, likely secondary to multiple head injuries, and the Veteran was not able to listen well. A GAF score of 68 was assigned. 

The Veteran underwent a VA mental examination in December 2000. The Veteran told the examiner that his PTSD was due to several factors, including: suffering abuse in service; a motor vehicle accident; the fact that his brother committed suicide; and the fact that as he was growing up multiple family members were injured on the farm where they lived. He told the examiner that his current symptoms included: nightmares 3 to 4 times a month; anxiety with difficulty being in large groups of people; difficulty building relationships and difficulty building trust; some depression and suicidal ideation in the past. The report of examination also noted the Veteran had a seizure disorder with the last occurring in October 1999. 

On mental status examination, the Veteran appeared unshaven and his slow speech sounded to the examiner like "whining." He was alert and oriented to three spheres, but eye contact was poor. Affect was dysphoric. Suicidal ideation and some auditory hallucinations were noted about one year before. PTSD was not included in Axis I diagnoses of dysthymia, alcohol abuse in remission, and marijuana abuse in remission. Borderline and histrionic personality traits were listed as an Axis II diagnosis and his seizure disorder was noted as an Axis III diagnosis. A GAF score of 65 was assigned reflecting both dysthymia and personality traits. The VA examiner stated there was no clear objective evidence to support a diagnosis of PTSD; that the Veteran's dysthymia was lifelong and chronic; and that personality traits were lifelong and not thought to have been caused by any single episode of abuse in service. 

According to a February 2001 VA medical record, the Veteran reported a continued improvement in mood, concentration, memory, enjoyment, sleep and appetite on his current medications. On mental status examination, the Veteran was unkempt but dressed appropriately. He had a dysthymic mood and flat affect. There was no indication of suicidal or homicidal ideations or of hallucinations. A GAF score of 68 was assigned. 

According to a May 2001 VA medical record the Veteran reported continued improvement. On mental status examination, the Veteran was unkempt but dressed appropriately. He had a dysthymic mood and flat affect. There was no indication of suicidal or homicidal ideations or of hallucinations. A GAF score of 68 was assigned. 

A July 2001 letter to the Veteran's representative from the licensed mental health counselor at the Gannon Center attempted to explain the Veteran's PTSD. The counselor noted that the Veteran's symptomatology included an exaggerated startle response, hypervigilance, difficulty concentrating, irritability or outbursts, and anger. It was also noted that sometimes he had a feeling of detachment or estrangement from others. 

During his July 2001 video conference Board hearing, the Veteran testified that he had many flashbacks to service and had flashbacks on a daily basis. See hearing transcript at p. 13. His wife testified that the Veteran got angry a lot and was moody every day. Id. at pp. 13-14. 

According to an August 2001 VA medical record, the Veteran had nightmares almost every night, sometimes related to his military experience. He had no daytime flashbacks; was bothered by loud noises; felt uncomfortable in crowds; and became irritable and angry. On mental status examination, the Veteran was unkempt but dressed appropriately. He had a dysthymic mood and flat affect. There was no indication of suicidal or homicidal ideations or of hallucinations. A GAF score of 68 was assigned and PTSD was not listed among the Axis I diagnoses. 

According to an October 2001 VA psychiatric record the Veteran's PTSD symptoms included nightmares about twice a week. His daytime symptoms were minimal, but sometimes he felt as if the walls were closing in when he was home alone. He had no flashbacks during the daytime. It was also noted that he avoided crowds since grade school. On mental status examination, the Veteran was unkempt but dressed appropriately. He had a dysthymic mood and flat affect. There was no indication of suicidal or homicidal ideations or of hallucinations. A GAF score of 60 was assigned with no PTSD diagnosis listed on Axis I. 

According to a December 2001 VA psychiatric record the Veteran denied panic attacks during the day or other anxiety symptoms. He was quoted as stating that he felt two drugs had helped control his anger outbursts. 

According to a January 2002 VA medical record, the Veteran's mood was described as pretty good and he denied other psychological concerns. On mental status examination, the Veteran was noted as unkempt, but dressed appropriately. He had a dysthymic mood and blunt affect. There was no indication of suicidal or homicidal ideation or hallucinations or delusions. A GAF score of 60 was provided and Axis I diagnoses did not include PTSD. 

According to a March 2002 VA psychiatry record the Veteran was controlling anxiety with relaxation techniques and not drugs. His mood was described as good with no anxiety. On mental status examination a GAF score of 65 was given with no Axis I diagnosis of PTSD noted. Instead he was diagnosed with a mood disorder due to general medical condition and frontal lobe dementia. 

In an April 2002 VA medical record, a VA psychologist noted a diagnostic impression of frontal lobe syndrome by history. No ongoing counseling was recommended due to what was considered the Veteran's limited ability to benefit from such counseling. 

A June 2002 VA medical record noted a GAF score of 55. PTSD was not noted in Axis I diagnosis after a mental status examination. 

According to a September 2002 VA medical record, the Veteran was not taking any antidepressant medication. He said his mood was good. His mood was euthymic and affect was mildly blunted. Diagnoses included an organic affective disorder and frontal lobe dementia. A GAF score of 58 was assigned. 

According to an October 2002 VA psychiatric record, the Veteran wanted to go to a hospital for safety reasons because of suicidal thoughts, apparently brought on by financial worries. Mood was depressed with a restricted and tearful affect. A mood disorder, an adjustment disorder, and frontal lobe dementia were diagnosed along Axis I. A GAF score of 42 was assigned. 

According to an October 2002 discharge summary from the VA hospital, the Veteran had been hospitalized for three days for suicidal ideation. It was noted that he planned to overdose or cut his wrists. PTSD symptoms were listed as one of many reasons for his thoughts of suicide. Diagnoses included adjustment disorder with depressed mood, frontal lobe dementia by history, a mood disorder due to general medical condition, and polysubstance abuse in remission. A GAF score of 41 was assigned. 

According to a November 2002 VA individual psychotherapy record, the Veteran admitted he did not get much treatment for PTSD. He said physical or emotional pain could trigger a flashback and that he had a depressed mood almost every day. 

The Veteran underwent a VA mental examination in December 2002. The examiner noted that the Veteran had recently been admitted to the inpatient ward for worsening suicidal ideation, mood swings, and depressive symptoms. The Veteran denied current suicidal ideation and psychotic symptoms. It was noted that he was previously diagnosed with seizure disorder due to brain trauma versus pseudoseizure. 

On mental status examination, the Veteran was alert and oriented to three spheres. He was mildly dishelved. Psychomotor was retarded. Mood was depressed and affect blunted. Thought content was devoid of suicide or psychotic symptoms. Memory was within normal limits. Insight and judgment were limited. Eye contact was poor. Diagnoses included: history of PTSD; mood disorder secondary to general medical condition; and history of alcohol and polysubstance abuse in full remission. Axis II diagnoses included a personality disorder and a borderline personality disorder. Axis III diagnoses included history of a seizure disorder versus pseudoseizures. The VA examiner stated that the Veteran's current symptoms were more likely associated with his head injury and depression secondary to this medical condition and also to his emotional intensity disorder. No GAF score was assigned. 

According to a December 2002 VA medical record the Veteran's depressed mood began 2 to 3 weeks before, but this was the time of year for it. This depression brought back memories from service, fleeting suicidal ideation without a plan, insomnia, nightmares, and restlessness. 

According to a January 2003 VA psychiatric record, the Veteran was depressed, but no longer suicidal. It was noted that he recently had frequent nightmares of past traumatic events of sexual abuse while in the military. He denied a history of flashbacks. He also reported hearing voices that were not command in nature. His mood was down and affect was flat. Diagnosis included PTSD with a GAF score of 57 assigned. 

Another January 2003 VA medical record noted that the Veteran was more depressed than his last visit. He reported that he had auditory hallucinations for years and that they bothered him. His mood was down and his affect was flat. Diagnoses included PTSD and a GAF score of 57 was assigned. A later January 2003 VA medical record noted that the Veteran's symptoms had improved with new medication. While he reported a deep depression on Sunday, his nightmares had decreased and he denied any suicidal ideation. 

A February 2003 VA medical record noted the Veteran's road rage on his way to the clinic. His symptoms included hyperactivity, irritability, and forgetfulness. It was noted that his ability to control his emotions and anger had improved. 

Another February 2003 VA medical record noted his mood was pretty good but he reported stress hit him hard related to financial difficulties. He also had new complaints of insomnia, nightmares and restless sleep. In a psychotherapy session he spoke about being around other people at the YMCA for several hours a day and said this actually helped his symptoms. 

According to a February 27, 2003 VA psychiatric record, Geodon had helped with auditory hallucinations. The Veteran continued to have PTSD flashbacks and nightmares. After a mental status examination, diagnosis was frontal lobe dementia by history, mood disorder due to a general medical condition, polysubstance abuse in remission, and PTSD. A GAF score of 60 was assigned. 

According to an April 2003 VA psychiatric record, the Veteran had a good mood and was not depressed. He did have nightmares, but no more flashbacks. PTSD-like symptoms were noted along the Axis I diagnosis along with frontal lobe dementia by history and a mood disorder. A GAF score of 65 was assigned. 

The Veteran underwent a VA mental examination in April 2003. His current symptoms included nightmares three to four times a month, including waking up trembling with fear. He continued to have anxiety and struggled with being present in large groups of people. It was noted that he had difficulty building relationships and a difficult time trusting people. The examiner also noted that the Veteran continued to have some ongoing depressive symptomatology and had been evaluated multiple times at a private facility for these situations. The Veteran also told the examiner of several incidents of suicidal ideation going back to his time in service. Hospitalizations in April 2000 and October 2002 for suicidal ideation also were noted. 

The Veteran complained of hearing voices, which he described as a "committee" of past acquaintances, although he admitted difficulty making out who these voices were. He told the examiner he dealt with these voices by trying to keep busy during the day, such as going to the YMCA for exercise or walking. He also complained of flashbacks that appeared to come like memories. These occurred approximately four times a month. He also reported that he was always on edge and often jumpy with loud noises. He was very anxious with large crowds. The Veteran's wife told the examiner that when the Veteran's family got together he often had a very short fuse and would blow up and have to stomp out the door. He also complained of feelings of powerlessness. 

On mental status examination, the Veteran was alert and oriented to three spheres. At the time of the hearing he was unshaven and unkempt. Eye contact was poor. The examiner noted that the Veteran sounded as if he had the verbal skills of a fifth grader and seemed to be almost "whining" during conversations. His mood was low; affect was flattened and blunted; and thought process was logical and concrete, but not very abstract. Insight and judgment were noted as poor while attention span, concentration, and memory appeared to be decreased. His psychomotor activity was blunted. Diagnoses along Axis I included PTSD with mild symptoms; dysthymia; polysubstance abuse in remission; and frontal dementia. Axis II diagnosis was a history of cluster B personality traits. A seizure disorder was noted as one of the Axis III diagnoses. A GAF score of 50 was assigned. 

The April 2003 VA examiner admitted that it was difficult to say which head injury resulted in the Veteran's current psychiatric presentation. Records show that the Veteran was hit in the head during service and sustained a head injury in a post-service 1978 motor vehicle accident. The examiner admitted that it was difficult to say whether the Veteran's symptoms at the time of the examination were exacerbated by his time in service. The Veteran exhibited significant injury to his brain that, the examiner said, could definitely have resulted in the personality changes and cognitive difficulties that the Veteran was then complaining of. The examiner also noted a very poor short- and long-term memory and that the Veteran read at about the third or fourth grade level. 

According to a May 2003 VA medical record, the Veteran reported increased signs and symptoms of a depressed mood, forgetfulness, anhedonia, and lack of concentration during the past week. In an individual psychotherapy session he complained of feeling depressed with bills piling up. 

According to a June 2003 VA psychiatric record, the Veteran reported a neutral mood with restricted, flat affect noted. 

An August 2003 neuropsychological assessment noted that the Veteran showed a mélange of neuropsychological deficits that suggested multifocal cerebral dysfunction, consistent with the effects of multiple traumatic brain injury with coup and contracoup injuries. Examination results also suggested an average IQ in an individual with a likely verbal learning disability. 

According to an August 2003 VA medical record, the Veteran's biggest complaint was not resting well. An euthymic mood was noted and affect was flat. Diagnoses included chronic PTSD. A GAF score of 65 was assigned. 

A September 2003 VA neuropsychological assessment included the VA neuropsychologist's impression that the Veteran suffered marked psychological distress and neuropsychiatric symptoms (including a frontal lobe syndrome referable to the combined effects of brain damage from a traumatic brain injury and from psychiatric disturbance. 

According to a September 2003 VA psychiatric record, the Veteran was sleeping 8 hours uninterrupted with Trazodone and his depression was stabilized. He reported obsessive compulsive like behaviors every day. 

According to an October 2003 VA medical record, the Veteran reported financial stressors. On mental status examination, the Veteran was noted dishelved. Mood was neutral and affect was flat. There was no indication of suicidal or homicidal ideation or of hallucinations. 

A later October 2003 VA medical record noted that the Veteran no longer complained of flashbacks and had problems recalling important aspects of the sexual abuse he endured. The Veteran reported he felt estranged and detached from others. After a mental status examination, diagnoses included chronic PTSD. A GAF score of 56 was assigned. 

A subsequent October 2003 VA medical record noted the Veteran's improved mood. 

A December 2003 VA medical record noted that the Veteran started Topamax to target anger and irritability and other PTSD symptoms. The Veteran said this helped and that he no longer complained of flashbacks. Mood was depressed and affect was flat. Diagnosis included chronic PTSD and a GAF score of 56 was assigned. 

Another December 2003 VA medical record showed organic brain syndrome, organic affective syndrome, and a depressive disorder listed among the Veteran's active medical problems during the month before he died. 

Another December 2003 VA medical record noted the Veteran's depressed mood and increased depression as the holiday season approached. 

According to a VA medical record dated in early January 2004, the Veteran was in a good mood and had a wonderful Christmas and New Year's. Mood was euthymic and affect was full and appropriate. There was no indication of suicidal or homicidal ideation or of hallucinations. 

According to a VA medical record dated in mid to late January 2004, the Veteran presented with a down mood and congruent affect. His current stressors were listed as taxes, lower back pain, and stomach upset. 

According to a VA medical record dated several days later, the Veteran denied irritability and reported that he was getting 7 hours of restful sleep. He also had no nightmares. He continued to attend church services and Narcotics Anonymous. It was noted that Topamax had significantly improved his anger and irritability. On mental status examination, mood was depressed and affect was flat. There was no indication of suicidal or homicidal ideations or of hallucinations. Diagnoses included chronic PTSD and frontal lobe disinhibition following a traumatic brain injury following a motor vehicle accident post-service in 1978. A GAF score of 56 was assigned. 

Resolving all reasonable doubt in favor of the Veteran and the appellant, for the period from June 24, 1999, the Board finds that the Veteran's PTSD was manifested by occupational and social impairment with deficiencies in most areas, or a 70 percent disability rating. Based on the observations made in the evidence noted above, the lay and medical evidence of record is in relative equipoise as to whether the Veteran's PTSD symptoms are more reflective of the symptomatology supporting a 70 percent disability rating during the period of his appeal. 

There was evidence of suicidal ideation, including two hospitalizations in April 2000 and October 2002, near continuous depression, impaired impulse control and irritability issues, neglect of personal appearance, and difficulty in adapting to stressful circumstances. This symptomatology supports a 70 percent disability rating. On the other hand some records, isolated in time, such as the August 1999 VA medical record, noted only such symptoms as isolation, anxiety, and nightmares, or that the Veteran during a mental status examination exhibited no suicidal ideation or hallucinations at the time he was examined. 

Moreover, GAF scores assigned to the Veteran in this time period ranged widely from 25 to 70, which represent symptomatology ranging from an inability to function in almost all areas to some mild symptoms. 

The Board observes that the Veteran was diagnosed with PTSD, major depression, an adjustment disorder, a mood disorder, frontal lobe dementia, and polysubstance abuse in remission. In addition, organic brain syndrome and organic affective syndrome were listed as current medical problems on his chart during the month before he died. The Board notes that while some symptoms, such as memory impairment or concentration difficulties, might be associated more with the Veteran's cognitive disorders, all of these symptoms may still be ascribed to the Veteran's PTSD in this case because medical evidence found in the file has not clearly and persuasively divided the symptomatology among his various disorders. The opinion of the April 2003 VA examiner cannot be considered competent in this regard as he noted that it was difficult to say whether the Veteran's head injury in service resulted in his current psychiatric presentation. In addition, both the December 2002 and April 2003 VA examiners failed to clearly state what psychiatric symptoms were attributable to only PTSD and not to his other diagnosed psychiatric disorders. See Mittleider v. West, 11 Vet. App. 181, 182 (1998) (if VA cannot distinguish by competent medical opinion the extent of symptoms that are attributable to service-related causes from those that are not, VA effectively must presume that all symptoms in question are related to service, i.e., part and parcel of the service-connected disability). See also Howell v. Nicholson, 19 Vet. App. 535, 540 (2006). Therefore, the Board finds that the symptomatoloy noted above tends to support a 70 percent rating under Diagnostic Code 9411. 

When, after careful consideration of all procurable and assembled data, a reasonable doubt arises regarding service origin, the degree of disability, or any other point, such doubt will be resolved in favor of the claimant. By reasonable doubt is meant one that exists because of an approximate balance of positive and negative evidence which satisfactorily proves or disproves the claim. It is a substantial doubt and one within the range of probability as distinguished from pure speculation or remote possibility. 38 C.F.R. § 3.102; see also 38 U.S.C.A. § 5107(b); Gilbert v. Derwinski, 1 Vet. App. 49 (1990). 

In this case, the Board finds that the evidence found within the claims file is, at the very least, in equipoise as to the question of whether the Veteran was entitled to a 70 percent rating at the time of his death for the period beginning June 24, 1999. There can be no doubt that further medical inquiry could be undertaken with a view towards resolving conflicts in the evidence, except that the Veteran died after filing his appeal for a higher rating and this matter comes before the Board as an accrued benefits claim that must be decided upon the evidence available at the time of his death. Therefore, granting the Veteran and the appellant the benefit of the doubt, the Board finds that under the circumstances of this case, the evidence of serious PTSD symptoms are sufficient to provide support for the award of an initial 70 percent disability rating for the period from June 24, 1999. 

The evidence of record for this time period does not show that the Veteran's PTSD symptoms were reflective of the criteria for or best approximate the next higher rating of 100 percent, which requires total occupational and social impairment. While there was some evidence of auditory hallucinations at different times during the period of this appeal, such cannot be considered persistent, as the Veteran often denied any hallucinations or delusions when examined by mental health professionals. The Veteran also did not exhibit the other symptoms noted in the criteria which suggests an assignment for a 100 percent rating. There was no objective evidence of gross impairment in thought processes or communication; no intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); no grossly inappropriate behavior; no persistent danger of hurting self or others; no disorientation to time or place; and no memory loss for names of close relatives, own occupation, or own name. In addition, information in the claims file shows that the Veteran enjoyed a good relationship with a supportive wife. While the Board recognizes that not all, or even any, of the symptomatology noted in the various rating criteria need be present to justify a particular rating, a review of the evidence discloses that the Veteran did not demonstrate total occupational and social impairment.

The Board finds that the symptomatology described above in the evidence for the period from June 24, 1999, is more consistent with the rating criteria for the 70 percent rating rather than with either a lower or a higher disability rating. Thus, the Board will resolve all reasonable doubt in this matter and find that a 70 percent rating for PTSD, but no higher, is warranted for this accrued benefits claim for the period from June 24, 1999. 

Consideration has been given to assigning a staged rating for this claim; however, a 70 percent rating has now been assigned for the entire rating period on appeal. At no other time during the appeal period has the evidence and the Veteran's PTSD symptoms warranted the assignment of a rating higher than what has been herein assigned. See Fenderson v. West, 12 Vet. App. 119 (1999). 

Finally, the Veteran's PTSD disability does not warrant referral for extraschedular consideration. In exceptional cases where schedular evaluations are found to be inadequate, consideration of an extraschedular evaluation is made. 38 C.F.R. § 3.321(b)(1). There is a three-step analysis for determining whether an extraschedular evaluation is appropriate. Thun v. Peake, 22 Vet. App. 111 (2008). First, there must be a comparison between the level of severity and symptomatology of the Veteran's service-connected disability and the established criteria found in the rating schedule to determine whether the Veteran's disability picture is adequately contemplated by the rating schedule. Id. If not, the second step is to determine whether the claimant's exceptional disability picture exhibits other related factors identified in the regulations as "governing norms." Id.; see also 38 C.F.R. § 3.321(b)(1) (governing norms include marked interference with employment and frequent periods of hospitalization). If the factors of step two are found to exist, the third step is to refer the case to the Under Secretary for Benefits or the Director of the Compensation and Pension Service for a determination whether, to accord justice, the claimant's disability picture requires the assignment of an extraschedular rating. Id. The rating criteria are not inadequate in this case; the Veteran simply did not meet the schedular criteria for a 100 percent rating in the time period examined in this appeal. 

However, there is evidence of marked interference with employment in this case. The Board will now consider the Veteran's entitlement to a TDIU, for purposes of accrued benefits. 

TDIU

Under the applicable criteria, total disability ratings for compensation based upon individual unemployability may be assigned where the schedular rating is less than total (100 percent), when it is found that the disabled person is unable to secure or follow a substantially gainful occupation as a result of a single service-connected disability ratable at 60 percent or more, or as a result of two or more disabilities, provided at least one disability is ratable at 40 percent or more and there is sufficient additional service-connected disability to bring the combined rating to 70 percent or more. 38 C.F.R. §§ 3.340, 3.341, 4.16(a). 

At the time of his death, the Veteran's only service-connected disability was PTSD, which the Board has found herein should be rated at 70 percent disabling. Thus, the minimum percentage requirements for a TDIU under 38 C.F.R. § 4.16(a) were met. However, meeting the minimum percentage requirements, alone, does not provide a sufficient basis for the award of a TDIU; as indicated above, whether the Veteran is actually unemployable due to a service-connected disability must also be considered. 

The central inquiry is "whether the veteran's service connected disabilities alone are of sufficient severity to produce unemployability." Hatlestad v. Brown, 5 Vet. App. 524, 529 (1993). Consideration may be given to the Veteran's education, special training, and previous work experience, but not to his age or to the impairment caused by nonservice-connected disabilities. See 38 C.F.R. §§ 3.341, 4.16, 4.19 (2005); see also Van Hoose v. Brown, 4 Vet. App. 361 (1993). 

The sole fact that a claimant is unemployed or has difficulty obtaining employment is not enough. A high rating in itself is recognition that the impairment makes it difficult to obtain or keep employment. The ultimate question, however, is whether the Veteran is capable of performing the physical and mental acts required by employment, not whether he can find employment. Van Hoose, 4 Vet App. at 363. 

In April 2003, the Veteran filed his claim for a TDIU in which he claimed he was disabled from working due to his service-connected PTSD. On his VA Form 21-8940 (Application for Increased Compensation Based on Unemployability) he noted work as a welder from October 1994 to January 1999 and then as a cab driver for an undetermined period in 1999. He reported a high school education with no subsequent vocational or job training. His welding employer reported that the Veteran quit his job and had not been entitled to disability or retirement benefits. The record shows that the Veteran was 47 years old at the time of his death. 

The appellant asserted that the Veteran was not able to work because of his PTSD. 

Before his death, according to VA treatment records associated with the claims file, the Veteran received medical treatment for PTSD, frontal lobe syndrome, depression, a mood disorder, organic affective syndrome, an organic brain syndrome not elsewhere classified, low back pain, impotence, postconcussion syndrome, hyperlipidemia, hypertension, sleep apnea, and gastroesophageal reflux disease. 

According to the report of an October 1999 private examination done for the Veteran's SSA disability claim, the examining physician was of the opinion that the Veteran was disabled by PTSD and other diagnosed disorders. He stated that it was unlikely that the Veteran would be able to sit for periods longer than 30 minutes without having to stand and walk around. This appraisal seemed to be based more on orthopedic and weight issues than on any mental or psychiatric consideration. 

In January 2000, a VA social worker noted that the Veteran was capable of working some type of job, although the Veteran felt he could not for various medical reasons. 

During his April 2000 RO hearing, the Veteran testified that he had two jobs in the previous 5 or 6 years; one lasted six months and the other for three and a half months. He also testified that since then he had been unemployed due to seizures twice a month. See hearing transcript at pp. 13-14. 

The December 2002 VA examiner noted that the Veteran had been unemployed since January 1999 due to back pain. 

The April 2003 VA examiner noted that the Veteran last worked as a cab driver in 1999 when he lost his job after complaining of a seizure. Later in the report of examination the examiner noted significant cognitive deficits as a result of head injuries during and after service. The examiner stated that it was difficult to determine which head injury contributed to his current psychiatric presentation. However, he noted that the Veteran had a poor memory and his reading and vocabulary were at about the third or fourth grade level. The April 2003 VA examiner stated that based on this assessment alone the Veteran was unlikely to maintain any gainful sense of employability. 

In light of the evidence, and resolving reasonable doubt in favor of the Veteran and the appellant, the Board finds that the Veteran before his death was not capable of securing and following a substantially gainful occupation as a result of his service-connected disability. As was noted above in the discussion concerning the Veteran's higher disability rating for his PTSD, while some of his symptoms, such as memory impairment or concentration difficulties, might be associated more with the Veteran's cognitive disorders, all of these symptoms were ascribed to the Veteran's PTSD because medical evidence found in the file did not clearly and persuasively divide the symptomatology among his various disorders. The opinion of the April 2003 VA examiner noted that it was difficult to say whether the Veteran's head injury in service resulted in his current psychiatric presentation. In addition, both the December 2002 and April 2003 VA examiners failed to clearly state what psychiatric symptoms were attributable to only PTSD and not to his other diagnosed psychiatric disorders. See Mittleider, 11 Vet. App. at 182 (if VA cannot distinguish by competent medical opinion the extent of symptoms that are attributable to service-related causes from those that are not, VA effectively must presume that all symptoms in question are related to service, i.e., are part and parcel of the service-connected disability). 

Therefore, the evidence of record suggests that the Veteran's service-connected PTSD, coupled with consideration of his limited educational background and intermittent work experience, precluded him from securing and following substantially gainful employment. The medical and lay evidence suggested that his PTSD, particularly his lack of anger management, operated as an occupational impairment. As noted above, in July 1999 the Veteran even went to the hospital, and later agreed to private psychiatric treatment, after becoming fearful he was going to hurt someone after a confrontation with a fellow employee at work. Shortly thereafter he stopped working as a cab driver and never returned to gainful employment. Resolving all reasonable doubt in the Veteran's favor, taking into consideration the opinion of the April 2003 VA examiner, the Board finds that it is at least as likely as not that the Veteran's service-connected PTSD precluded him from obtaining and maintaining substantially gainful employment during the period at issue herein. 

In this case, because of the Veteran's service-connected PTSD, he would likely have had difficulty working again after he last worked as a cab driver in 1999. Moreover, the evidence discussed above in connection with the higher rating for his PTSD shows that if the Veteran had been able to secure employment after 1999 he would most likely have lost that position quickly due to his inability to control his temper and his anger or because of his difficulty in handling stress. 

The Board finds that the lay and medical evidence of record indicates that the Veteran would most likely have been unable to secure or maintain substantially gainful employment due alone to his service-connected PTSD. The Board finds that this matter is at the point of equipoise. The April 2003 VA examiner opined that the Veteran's cognitive deficits, which arose from a head injury either in service or post service, precluded gainful employability. Otherwise, there is no formal employability opinion prepared by a VA medical professional after the Veteran filed his TDIU claim. The Board believes that the evidence strongly suggests that the Veteran's service-connected PTSD was significant enough to preclude him from obtaining substantially gainful employment. This is especially true in light of the Mittleider case, which requires attributing all of the Veteran's psychiatric symptomatology to the Veteran's PTSD, and the uncertainty of the April 2003 VA examiner as to whether the Veteran's head injury in service resulted in his April 2003 psychiatric presentation. 

Therefore, based on its review of the relevant evidence, and resolving reasonable doubt in favor of the Veteran and the appellant, the Board finds that it is as likely as not that the Veteran was precluded from work due to his service-connected PTSD during the entire appeal period at issue. Therefore, a total disability rating based upon individual unemployability for accrued purposes is warranted. 38 U.S.C.A. § 5107(b) (West 2002); Gilbert v. Derwinski, 1 Vet. App. 49 (1990). 


ORDER

Entitlement to an initial disability rating of 70 percent for PTSD, from June 24, 1999, for accrued benefits purposes, is granted, subject to controlling regulations applicable to the payment of monetary benefits. 

TDIU for accrued benefits purposes is granted during the entire appeal period, subject to controlling regulations applicable to the payment of monetary benefits. 



____________________________________________
BARBARA B. COPELAND
Veterans Law Judge, Board of Veterans' Appeals


Department of Veterans Affairs